# In the United States Court of Federal Claims

No. 14-1158C

(Filed: December 15, 2015)

|  |  |  |
|---|---|---|
| ROBERT M. LAUGHLIN, | ) | Military pay dispute; claim by dental |
|  | ) | surgeon for monetary relief stemming |
|  | ) | from the Navy's alleged miscalculation of |
| Plaintiff, | ) | his obligated service period; retention |
|  | ) | bonus; 37 U.S.C. § 301e; incentive special |
| v. | ) | pay; 37 U.S.C. § 302b |
|  | ) |  |
| UNITED STATES, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

Eric S. Montalvo, The Federal Practice Group, Washington, D.C. for plaintiff.

Devin A. Wolak, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

In this military pay case, plaintiff Robert M. Laughlin challenges the determination by the United States Navy ("Navy" or "government") and the Board for Correction of Naval Records ("Navy Board") of his active duty service obligation to the Navy following his military-funded medical training. Commander Laughlin received extensive training in dental medicine and related surgical specialties for a continuous period from August 1998 to June 2007. As a condition of receiving military-funded training, Navy medical and dental officers such as plaintiff are required to serve in an active duty status for a certain number of years, as defined by statute and regulations of the Department of Defense.

Commander Laughlin contends that in the summer of 2003, after the first year of his medical residency, he was told he was being transferred to a military funding program that would allow him to fulfill his active duty service obligation *concurrently* with both his continued training and other service obligations incurred as a result of such training. By plaintiff's calculations, his service obligation to the Navy extended only to July 1, 2011. Conversely, the Navy asserts that plaintiff's active duty obligation was to be served *consecutively* to the completion of his training programs, and that consequently plaintiff's training-related service

obligation will not end until July 1, 2017.  Commander Laughlin seeks this court's review of a decision by the Navy Board affirming the Navy's calculation of plaintiff's obligated service date.

Commander Laughlin also asserts that because of the Navy's miscalculation of his obligated service date, he is entitled to additional multiyear retention bonuses and incentive special pay available to officers in the Navy's Dental Corps.  In 2013, plaintiff agreed to extend his service obligation for three years–from July 1, 2017 to July 1, 2020–in return for a Dental Officer Multiyear Retention Bonus and the associated Multiyear Incentive Special Pay.  Plaintiff contends that if the Navy had accurately concluded that his training-related service obligation ended on July 1, 2011, he would have been able to apply for two separate four-year extensions of his service obligation–bringing his obligated service date to 2019–which would in turn have entitled him to additional special pay.

The government has moved to dismiss Commander Laughlin's complaint under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") for lack of subject matter jurisdiction.  Def.'s Mot. to Dismiss or, Alternatively, for Judgment upon the Administrative Record ("Def.'s Mot."), ECF No. 22.[1]  Alternatively, the government has moved for judgment on the administrative record under RCFC 52.1(c), to which Commander Laughlin has responded by submitting a cross-motion for judgment on the administrative record.  Def.'s Mot. at 13-16; Pl.'s Opp'n to Def.'s Mot. . . . and Pl.'s Cross-Mot. for Judgment on the Administrative Record and Pl.'s Mot. to Supplement the Administrative Record ("Pl.'s Cross-Mot."), ECF No. 26.  These motions have been fully briefed and are ready for disposition.  The court has concluded that the government's motion to dismiss should be denied, but that the government is entitled to judgment in its favor on the administrative record.

## FACTS[2]

A.  *Plaintiff's Medical Training and Active Duty Service Obligation*

Commander Laughlin entered the Navy through the Health Professions Scholarship Program ("HPSP") on May 8, 1998.  AR 434-40;[3] Am. Compl. ¶ 7, ECF No. 21; Def.'s Mot. at

---

[1]The government's motion refers only to RCFC 12(b).  However, from the substance of the motion, the court understands it to be a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1).  *See* Def.'s Mot. at 12-13 (addressing this court's subject matter jurisdiction under the Tucker Act).

[2]The recitations that follow constitute the court's findings of fact based on the administrative record filed pursuant to RCFC 52.1(a).  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005); *Santiago v. United States*, 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings . . . from the record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States*, 216 Fed. Appx. 977, 979 (Fed. Cir. 2007)).

[3]Plaintiff was a member of the United States Air Force and United States Air Force Reserve from November 1990 to May 1998.  AR 161, 215, 217.

7. As part of this program, plaintiff signed a service agreement that stated, in relevant part, "I understand that in return for . . . 4 year[s] of scholarship in the [HPSP], I shall serve 4 years . . . on extended active duty." AR 437-40. The agreement also stated that "I may not serve all or any part of the [active duty service obligation] incurred by participation in this program concurrently with any other military obligation." AR 439 ¶ 17(b). After being accepted to the HPSP, plaintiff attended the University of Pittsburgh's School of Dental Medicine from August 1998 to May 2002. Am. Compl. ¶ 7; Def.'s Mot. at 7.

      Following completion of his training at the University of Pittsburgh, Commander Laughlin began an oral and maxillofacial surgery residency at Louisiana State University's New Orleans Charity Hospital through the Navy's Financial Assistance Program ("FAP"). Am. Compl. ¶ 8; Def.'s Mot. at 7. Under the provisions of the FAP, plaintiff incurred an additional five years of obligated active duty service–one year for each of his four years of residency, plus one additional year. Am. Compl. ¶ 8; *see also* AR 111-12 (plaintiff's statement to the Navy Board, quoting Department of Defense Instruction ("DoDI") 6000.13, § 6.4.9: "The [active duty service obligation] for a FAP participant shall be . . . the actual number of years of FAP sponsorship, plus one year."). Like the HPSP, the regulations for the FAP state that "[n]o portion of an [active duty service obligation] may be satisfied . . . [c]oncurrently with any other [active duty service obligation] or with an obligation incurred for DoD-subsidized pre-professional (undergraduate) education or training, or prior long-term health or health-related education or training, unless otherwise specified in this Instruction." DoDI 6000.13, § 6.6.2.[4] The instruction also states that "[t]ime spent in military internship or residency training shall not be creditable in satisfying the [active duty service obligation]." DoDI 6000.13, § 6.4.9.

      On July 1, 2003, after completing the first year of his residency, Commander Laughlin transferred from the FAP to the Navy's Duty Under Instruction ("DUINS") program. AR 203-212; Am. Compl. ¶ 11; Def.'s Mot. at 7. This transfer did not substantively change plaintiff's residency; rather, it shifted the funding for his residency from one graduate dental education program to another. Am. Compl. ¶ 11; Pl.'s Cross-Mot. at 2-3 (stating that plaintiff was transferred because "there was an extra line of accounting" for the DUINS program). The FAP and DUINS programs have the same requirements for obligated active duty service, including the same prohibition on satisfying an active duty service obligation incurred through the program concurrently with any other training-related service obligation. *See* AR 522-23 (letter to plaintiff's counsel from the Assistant General Counsel, Navy Office of the Assistant Secretary (Manpower and Reserve Affairs), discussing active duty service obligations for all "long-term health or health-related education or training" under DoDI 6000.13, including HPSP, FAP, and DUINS).[5]

---

      Citations to the administrative record ("AR") refer to the record filed on July 7, 2015, ECF No. 19. That record is paginated sequentially. *See* AR 112.

      [4]Plaintiff's statement to the Navy Board quoted this regulation in part but omitted the first clause ("[n]o portion . . . may be satisfied"); as a result, his statement suggested that the FAP obligation *could* be served concurrently with other service obligations.

      [5]In his letter, the Assistant General Counsel noted that DoDI 6000.13, § 6.6.3.1 contains an exception stating that active duty service obligations incurred for residencies or fellowships in

3

Following the completion of his residency in July 2006, Commander Laughlin attended a one-year head and neck surgery and microvascular fellowship at the University of Michigan. Am. Compl. ¶ 17. The Navy accepted plaintiff's application for funding of this program. AR 213-235. In his funding application, plaintiff stated "[m]y commitment thus far to the Navy is nine years. I fully understand that if accepted to proceed with a fellowship in head and neck trauma and reconstruction this will increase my overall commitment." AR 215. The training agreement included with plaintiff's notification of acceptance for the fellowship indicated that he would incur one additional year of obligated active duty service. AR 234.[6] The agreement also stated: "Time spent in any [graduate professional education] program does not fulfill previously incurred [active duty service] obligation. [The active duty service obligation] incurred from this agreement and any other [active duty service obligation] will be satisfied *concurrently* for training in a [m]ilitary [f]acility and *consecutively* for training in a [c]ivilian [f]acility at the conclusion of the training program." *Id.* (emphasis in original).

On July 9, 2007, Commander Laughlin reported for duty at the Naval Medical Center in San Diego. AR 479-80; Am. Compl. ¶ 18; Def.'s Mot. at 8. Plaintiff continued to serve at this same duty station for the next few years. AR 481-94. He was promoted to his current rank of Commander and selected to lead the San Diego Naval Medical Center's dental department in 2014. AR 495-96.

B. *Plaintiff's Dispute Over His Active Duty Obligated Service Date and Subsequent Request for Resignation*

According to Commander Laughlin, personnel at the Navy Bureau of Medicine's Special Pay Office informed him on two occasions, once in 2007 and again in 2008, that he would complete his active duty service obligation on July 1, 2011. Am. Compl. ¶¶ 18-19.[7] Plaintiff

---

a *military* facility "may be served concurrently with other [active duty obligations] or with obligations incurred for DoD-sponsored . . . training or prior long-term health or health-related education or training." *See* AR 522-23. This exception did not apply to plaintiff because all of his dental training was in civilian facilities. *See* Am. Compl. ¶¶ 8, 17 (reciting plaintiff's training at Louisiana State University and the University of Michigan); Pl.'s Cross-Mot. at 3.

[6]The copy of the notification letter in the administrative record includes two enclosures: an active duty obligation agreement and a declination of training. Neither copy of the enclosures is signed by plaintiff.

[7]Plaintiff asserts that an obligated service date of July 2011 is consistent with what he was told by Captain Barton Welbourn (Ret.), former deputy chief of the Navy Dental Corps, when plaintiff entered the DUINS program in 2003. Am. Compl. ¶¶ 11, 20. According to plaintiff, he was told he would begin satisfying his four-year HPSP obligation on July 1, 2003 when he entered the DUINS program. Am. Compl. ¶ 20; Pl.'s Cross-Mot. at 4. He also asserts that he incurred a two-year obligation based on his one year of residency funded through the FAP, which he would begin serving on July 1, 2007 (after fulfilling his HPSP obligation) and would complete on June 30, 2009. Am. Compl. ¶ 20; Pl.'s Cross-Mot. at 4; *see also supra*, at 3 (noting the additional one-year obligation associated with FAP sponsorship). Finally, plaintiff

4

also claims he was informed by the Special Pay Office in 2009 that his obligated service date was in fact July 1, 2012. Am. Compl. ¶ 20. On March 3, 2009, plaintiff contacted Captain Andrew Peters in the Navy Medicine Manpower, Personnel, Training & Education Command for clarification on this date. Am. Compl. ¶ 21; *see also* AR 406 (e-mail from plaintiff to Captain Peters stating "I spoke with special pays HM2 Haney and he has my HPSP payback done on July 31, 2007, and my residency and fellowship payback completed on July 31, 2012 which sounds great."). Plaintiff also asked Captain Peters for a copy of his service agreement for his one-year fellowship at the University of Michigan because, according to plaintiff, "[t]his was done during Hurricane Katrina and a lot of [plaintiff's personal] records were ruined." AR 406. Captain Peters responded that he had a copy of the agreement in plaintiff's file, but it was not signed; he sent plaintiff the unsigned copy and recommended that plaintiff sign it for his records. Am. Compl. ¶ 22; AR 406. Plaintiff did not sign this copy of the agreement. Am. Compl. ¶ 22.

Over a year later, on July 21, 2010, Commander Laughlin contacted Captain Peters to request that his active duty obligated service date be changed to June 2011. AR 409-10. Plaintiff asserted that he never signed a service agreement for his one-year fellowship at the University of Michigan, and therefore should not have incurred a service obligation for this time period. *Id.*[8] Plaintiff stated that changing the date of his active duty obligation would "allow [him] the option to explore signing a multi-year [retention] bonus a year earlier." AR 410; Am. Compl. ¶ 23.

Captain Peters responded to plaintiff on September 3, 2010 after doing additional research on Commander Laughlin's active duty service obligation. AR 383-85. Am. Compl. ¶ 26. Captain Peters informed plaintiff that the database maintained by the Navy Medicine's Special Pay Office contained an error, and that plaintiff's obligated service date was in fact July 2016 (calculated based on plaintiff's nine years of military-funded training ending in July 2007). AR 383; Am. Compl. ¶ 26; Def.'s Mot. at 9. On September 8, 2010, the Navy further corrected plaintiff's obligated service date to July 2017 because the Navy Bureau of Medicine had failed to account for the additional year of obligation that plaintiff incurred during the first year of his residency in the FAP. AR 381-82; *see also* AR 111-12 (plaintiff's statement to the Navy Board, quoting the provision in DoDI 6000.13, § 6.4.9 requiring an additional one-year service obligation for FAP-sponsored training). The following day, Captain Ed Reeg, deputy chief of the Navy Dental Corps, discussed the revised obligated service date with plaintiff and advised him that if plaintiff disagreed with the revision, he should appeal to the Navy Board. AR 320-22; Am. Compl. ¶ 30.

---

asserts that he had a three-year "DUINS residency" obligation and a one-year fellowship obligation (for a total of four years), which he also began satisfying on July 1, 2007 and completed on June 30, 2011. Am. Compl. ¶ 20; Pl.'s Cross-Mot. at 4; *see also* AR 324-25 (plaintiff's summary of his calculations regarding his obligated service).

[8]Plaintiff appears now to concede that he incurred a service obligation for his one-year fellowship, but asserts that his obligated service date should nevertheless be July 1, 2011. Am. Compl. ¶ 20; Pl.'s Cross-Mot. at 4.

5

Instead of seeking review by the Navy Board, plaintiff, through counsel, sent a letter to Captain Elaine Wagner, chief of the Navy Dental Corps, on November 3, 2010 contesting the Navy Bureau of Medicine's calculation of his obligated service date. AR 129-30; Am. Compl. ¶ 36. Captain Wagner reiterated that the correct obligated service date was July 2017, based on the statutory requirements of 10 U.S.C. § 2123 and the regulations in DoDI 6000.13. AR 129. Captain Wagner also advised plaintiff that the best way to contest this determination was to appeal to the Navy Board. *Id.*

On December 21, 2010, Commander Laughlin, through counsel, submitted an application to the Navy Board, requesting that his active duty obligated service date be changed to July 2011 "or at the maximum July[] 2012 should the Board interpret that there was mutual consent regarding an additional year of [service obligation] pursuant to the [University of Michigan] fellowship." AR 109. Plaintiff indicated that the revised obligated service date of July 2017 had a "direct impact on [his] ability to separate from the service," and therefore he requested an "expedited review." AR 109-10.[9]

On November 16, 2011, while his request for relief was pending with the Navy Board, plaintiff submitted an Unqualified Resignation Request from Active Duty. AR 22-24. Plaintiff indicated he would complete his active duty obligation on September 30, 2012 because he had accepted the Navy's incentive special pay for fiscal year 2012, and thereby agreed to remain on active duty until that date. AR 24. Plaintiff stated that his "training obligation payback is currently with the [Navy Board] for review," but that his calculation of his active duty obligated service date was based on the "Special Pays Office original documented calculation of 30 JUN 2011." *Id.*

The Navy Board concluded on November 28, 2011 that there was insufficient evidence "to establish the existence of probable material error or injustice" in the Navy's calculation of Commander Laughlin's active duty obligated service date as July 1, 2017. AR 43; Am. Compl. ¶ 46; Def.'s Mot. at 10. In coming to this conclusion, the Navy Board reviewed an advisory opinion submitted by Captain Wagner on February 14, 2011 and her revised opinion submitted on September 14, 2011. AR 47-48, 51-55. It also considered an advisory opinion by Captain Peters submitted on June 30, 2011. AR 49-50. The Navy Board found that even if plaintiff had received erroneous information that his active duty obligation would be satisfied concurrently once he transferred to the DUINS program, "such erroneous information should not serve as a basis to change the obligated service requirements provided by law and regulation." AR 44. The Navy Board also pointed to plaintiff's fellowship application in 2005, in which he stated "[m]y commitment thus far to the Navy is nine years," as evidence that plaintiff not only knew his obligation extended beyond 2011, but also knew he was incurring an additional obligation by pursuing the fellowship. AR 45, 215.

---

[9]This statement about separating from the Navy suggests that as of December 2010, plaintiff was no longer interested in "explor[ing] signing a multi-year bonus" (which would require an additional service obligation), as he had indicated to Captain Peters in July 2010. *See* AR 410; Am. Compl. ¶ 23.

6

On May 25, 2012, Commander Laughlin, through counsel, asked Robert Woods, Assistant General Counsel, Navy Office of the Assistant Secretary (Manpower and Reserve Affairs), to review "the circumstances surrounding the [Navy Board's] decision." AR 9; Am. Compl. ¶ 50; Def.'s Mot. at 11. Mr. Woods replied on September 13, 2012, concluding that the Navy Board did not handle plaintiff's case "in an erroneous or fraudulent manner or in bad faith." AR 9. Mr. Woods also stated that after reviewing the relevant statutes and regulations, he agreed with the Navy Board's calculation of plaintiff's active duty obligated service date as July 1, 2017. AR 10-12.

In the interim, Commander Laughlin's request for resignation was addressed by various officials within the Navy's Personnel Command. AR 26-32. In light of the Navy Board's decision and the Navy Bureau of Medicine's calculation of plaintiff's active duty obligated service date as July 1, 2017, the officials recommended disapproval of plaintiff's request because a waiver of plaintiff's remaining service requirement would be excessive. *Id.* The Chief of Naval Personnel disapproved plaintiff's resignation request in March 2013. AR 34.

C. *Plaintiff's Application for a Dental Officer Multiyear Retention Bonus and Multiyear Incentive Special Pay*

In November 2012, while his request for resignation was still pending, Commander Laughlin applied for dental incentive special pay for fiscal year 2013. AR 7; Am. Compl. ¶ 58 & n.15; Def.'s Mot. at 11. This request was approved, and plaintiff received $30,000 in exchange for his agreement to remain on continuous active duty for one year, or until September 30, 2013. AR 7-8.

On May 7, 2013, after his request for resignation was denied, Commander Laughlin applied for a three-year Dental Officer Multiyear Retention Bonus and accompanying Multiyear Incentive Special Pay. AR 1-2; Am. Compl. ¶ 64; Def.'s Mot. at 11. In his request, plaintiff stated that "[t]his obligation shall be for a period of 3 years beyond any existing active military service obligation for education or training." AR 1. Plaintiff also indicated that his obligated service date for education or training was July 1, 2017. AR 2. Plaintiff's application was approved and he was authorized to receive $38,000 per year for the retention bonus and $50,000 per year for the incentive special pay, and his obligated service date was adjusted to July 1, 2020. AR 4; Am. Compl. ¶ 65; Def.'s Mot. at 11.

Commander Laughlin filed his complaint on December 1, 2014, asking the court to set aside the Navy Board's findings from November 2011, declare that plaintiff's active duty obligated service date should be amended to July 1, 2011, and award plaintiff certain retention bonus amounts and incentive special pay to which he allegedly would be entitled but for the Navy's miscalculation of his service obligation. Compl. ¶ 1. His amended complaint was filed on July 28, 2015. Am. Compl. On August 14, 2015, the government moved to dismiss the amended complaint for lack of subject matter jurisdiction, or alternatively, for judgment on the administrative record. Def.'s Mot. at 1. Plaintiff's cross-motion for judgment on the administrative record and motion to supplement the administrative record were filed on

7

September 21, 2015.  Pl.'s Cross-Mot. at 1.[10]

## STANDARDS FOR DECISION

### A.  *Subject Matter Jurisdiction*

The plaintiff must establish this court's jurisdiction over the subject matter of his claim before the court can proceed to the merits of the claim.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Anderson v. United States*, 59 Fed. Cl. 451, 454-55 (2004).  In this instance, the court's subject matter jurisdiction is defined by the Tucker Act, 28 U.S.C. § 1491, which grants jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Because the Tucker Act "does not confer any substantive rights upon a plaintiff," the plaintiff also "must establish an independent substantive right to money damages from the United States – that is, a money-mandating source within a contract, regulation, statute or constitutional provision – in order for the case to proceed."  *Volk v. United States*, 111 Fed. Cl. 313, 323 (2013) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976); *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1306 (Fed. Cir. 2008)).

In considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the court must construe the allegations of the complaint in the light most favorable to the non-moving party.  *Anderson*, 59 Fed. Cl. at 455 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Vanalco, Inc. v. United States*, 48 Fed. Cl. 68, 73 (2000)).  If the court determines that it does not have jurisdiction over a claim, it must dismiss the claim. *See* RCFC 12(h)(3).

### B.  *Judgment on the Administrative Record*

RCFC 52.1 governs motions for judgment on the administrative record.  When, in a motion under RCFC 52.1(c), this court is called upon to address a decision of a military correction board, to obtain relief, the plaintiff must show that the board's decision was "arbitrary, capricious, unsupported by substantial evidence, or contrary to law."  *Anderson*, 59 Fed. Cl. at 455 (quoting *Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998)); *see also Volk*, 111 Fed. Cl. at 325 (citing *Arens v. United States,* 969 F.2d 1034, 1037 (Fed. Cir. 1992); *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed. Cir. 1986)). "Thus, correction board decisions 'may be reviewed for failure to correct plain legal error committed by the military,' including 'the military's violation of statute, or regulation, or published mandatory procedure, or unauthorized

---

[10]In a motion to supplement the administrative record, plaintiff offered three exhibits containing e-mails not previously included in his appeal to the Navy Board to "provide necessary context for this [c]ourt's review."  The exhibits provide additional threads to e-mails and documents already included in the administrative record.  Plaintiff's motion is GRANTED because these exhibits serve to complete documents contained in partial form in the administrative record, but the additional exhibits do not affect the court's findings regarding the relevant facts in the case.

8

act.'" *Volk*, 111 Fed. Cl. at 325 (quoting *Dodson v. United States,* 988 F.2d 1199, 1204 (Fed. Cir. 1993) (internal quotation marks omitted)).

## ANALYSIS

### A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

In its motion to dismiss, the government asserts that this court does not have subject matter jurisdiction over Commander Laughlin's complaint because the relevant statues governing military bonuses and incentive special pay for dentists and dental surgeons (37 U.S.C. §§ 301e and 302b) are not "money-mandating." Def.'s Mot. at 12-13 (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (requiring plaintiffs seeking relief in this court under the Tucker Act to identify a separate source of substantive law that creates a right to money damages)). Plaintiff's complaint includes two causes of action: (1) that the government incorrectly calculated his active duty service obligation, and (2) that he is owed additional multiyear retention bonuses and incentive special pay because of this miscalculation. Am. Compl. ¶¶ 66-78. Plaintiff is seeking both declaratory relief and money damages. Am. Compl. at 19-20.

### 1. *Declaratory relief to adjust plaintiff's active duty obligated service date.*

In his first cause of action, plaintiff claims that the government's calculation of his active duty obligation was "arbitrary, capricious, unsupported by evidence, and contrary to law." Am. Compl. ¶ 6. As relief, plaintiff is seeking a declaratory judgment that his training-related active duty obligation terminated on July 1, 2011. Am. Compl. at 19.

Under the Tucker Act, the court has authority to award equitable relief in the form of a declaratory judgment "only when such an award would be ancillary to an affirmative obligation of the federal government to pay money damages." *Anderson*, 59 Fed. Cl. at 456 (citing *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) ("[E]quitable relief [in Tucker Act suits] must be 'an incident of and collateral to' a money judgment." (quoting 28 U.S.C. § 1491(a)(2)))). For government employees, including members of the military, the Tucker Act gives this court jurisdiction to "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records," but only when such an order would "provide an entire remedy and . . . complete the relief afforded by the judgment [on a claim for monetary damages under the Act]." 28 U.S.C. § 1491(a)(2); *see also Mercier v. United States*, 114 Fed. Cl. 795, 800 (2014) (discussing the requirement under the Tucker Act for declaratory judgments to be attendant to an award of a money damages), *rev'd in part on other grounds*, 786 F.3d 971 (Fed. Cir. 2015). Accordingly, the court has jurisdiction over cases where the plaintiff is claiming a monetary entitlement as a result of a correction board's failure to correct legal and factual errors in a service member's records. *See, e.g.*, *Richey v. United States*, 322 F.3d 1317, 1323 (Fed. Cir. 2003) ("If an officer elects to pursue a remedy before the Corrections Board, after the Board renders a final decision, the officer may effectively obtain review of that decision in the Court of Federal Claims by filing suit under the Tucker Act."); *Laningham v. United States*, 30 Fed. Cl. 296, 304 (1994) ("[I]t is a well-settled principle of law that the [Court of Federal Claims] has jurisdiction over military pay cases involving parties who

allege that they are due back pay because a military [c]orrection [b]oard . . . fail[ed] to correct legal and factual errors in the record.").

Here, plaintiff's active duty obligated service date is not directly tied to monetary damages. In other words, Commander Laughlin would not automatically be entitled to additional military pay if his obligated service date was changed. Nonetheless, the court must assume for the sake of the government's motion to dismiss on jurisdictional grounds that plaintiff has stated a valid claim in his *second* cause of action—namely, that the Navy precluded plaintiff from applying for and receiving additional multiyear retention bonuses and incentive special pay because of the incorrect calculation of his obligated service date. To restate the matter, the court has to address the Navy Board's alleged failure to correct plaintiff's military records in the court's consideration of plaintiff's second cause of action claiming monetary damages. Therefore, under 28 U.S.C. § 1491(a)(2), the court has subject matter jurisdiction over plaintiff's first cause of action so long as a money-mandating source of law is involved respecting the second cause of action.

      2.  *Monetary damages for "earned" multiyear retention bonuses and incentive special pay.*

The salient question regarding plaintiff's second cause of action is whether the statute governing the Dental Officer Multiyear Retention Bonus, 37 U.S.C. § 301e, and that pertaining to the Multiyear Incentive Special Pay, 37 U.S.C. § 302b, are money-mandating.

The statute governing the Dental Officer Multiyear Retention Bonus states that "[a] dental officer . . . who executes a written agreement to remain on active duty for two, three, or four years after completion of any other active-duty service commitment *may*, upon acceptance of the written agreement by the Secretary of the military department concerned, be paid a retention bonus." 37 U.S.C. § 301e(a)(1) (emphasis added). The government argues that because this statute uses the permissive term "may" and the relevant Navy regulation, OPNAVINST 7220.17, describes this as a "discretionary bonus," there is not an entitlement to military pay sufficient to invoke this court's jurisdiction under the Tucker Act. Def.'s Mot. at 13 (citing *Adair v. United States*, 648 F.2d 1318, 1322 (Ct. Cl. 1981) ("[A] statute providing for solely discretionary payment of money does not give rise to a 'right to recover money damages from the United States.'" (quoting *United States v. Testan*, 424 U.S. 392, 396 (1976)))).

The use of the permissive "may" ordinarily creates the presumption that a statute is discretionary and not mandatory. *See, e.g., Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) ("There is a presumption that the use of the word 'may' in a statute creates discretion."). However, the court in *Doe* also noted that this presumption may be overcome "when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Id.* (quoting *Samish Indian Nation v. United States,* 419 F.3d 1355, 1364-65 (Fed. Cir. 2005) (in turn citing *Perri v. United States,* 340 F.3d 1337, 1342-43 (Fed. Cir. 2003))).

The court also must take into account the Supreme Court's ruling that statutes involving military reenlistment bonuses are money-mandating because of their long history and the attendant expectation that the bonus will be paid if the service member otherwise meets the applicable requirements. *See United States v. Larionoff*, 431 U.S. 864, 865 n.1, 868-73 (1977) (concluding that the statute providing a reenlistment bonus for active duty soldiers, 37 U.S.C. § 308, was money-mandating, noting that "[t]he Court of Appeals opinion traces the history of this [reenlistment bonus] policy from 1795"); *see also Hale v. United States*, 107 Fed. Cl. 339, 345-46 (2012) (finding that Chapter 5 of Title 37, 37 U.S.C. §§ 301-374, titled "Special and Incentive Pays" includes a number of statutes using the word "may" that are nevertheless money-mandating under the rationale in *Larionoff*).[11]

Section 301e of Title 37 satisfies the first factor identified in *Doe* (originating in *Perri* and *Samish Indian Nation*) to overcome the presumption that a statute using the word "may" is discretionary. The Section provides "clear standards" that must be met by dental officers to receive the retention bonus. *See* 37 U.S.C. § 301e(b) (identifying five requirements for dental officers to be "automatically eligible" for the bonus). The second factor is also met. The statute does not provide a precise amount of bonus to be paid, but it does set a maximum amount per year covered by a four-year service agreement, and directs that the yearly retention bonus amount "shall be reduced" for two-year and three-year agreements. 37 U.S.C. § 301e(a)(2).[12] A comparative statutory analysis illuminates an assessment of the third factor. Although the statute does not explicitly "compel payment" of the retention bonus once a dental officer has met the specified requirements, it does state that dental officers who meet specified requirements are "automatically eligible" for the bonus, as contrasted to other officers who may receive a similar bonus at the Secretary's discretion. *Compare* 37 U.S.C. § 301e(b) (describing officers who are automatically eligible), *with* 37 U.S.C. § 301e(c) (giving the Secretary discretion to extend the bonus to other dental officers).[13] Therefore, the provisions of 37 U.S.C. § 301e are sufficient to

---

[11]In its reply in support of its motion to dismiss, the government "acknowledges that, under the *Hale* analysis, [its] motion to dismiss should be denied. However, because *Hale* is not binding upon this [c]ourt, [the government] respectfully take[s] the position that this [c]ourt should not follow it." Def.'s Reply in Support of Def.'s Mot. & Resp. to Pl.'s Cross-Mot. ("Def.'s Reply") at 3, ECF No. 27. The court rejects this position, adopts the analysis in *Hale*, and agrees that it is dispositive of the precise issue raised in the present case.

[12]Of note, 37 U.S.C. § 308, which was the subject of *Larionoff*, also only specifies a maximum bonus amount. *See* 37 U.S.C. § 308(a)(2).

[13]Subsection 301e(b) sets out five particular requirements that must be met for dental officers to be "automatically eligible" for a multiyear retention bonus. *See* 37 U.S.C. § 301e(b)(1)-(5). Although plaintiff does not specifically address this third *Doe* factor in his response to the government's motion, his complaint inferentially alleges that he falls within the category of dental officers who would be "automatically eligible" for the retention bonus. *See* Am. Compl. ¶¶ 8, 77 (identifying plaintiff as an "Oral and Maxillofacial Surgery Dental Officer," which is the key distinction between officers who are automatically eligible for the bonus and those who are not). A closer question would arise respecting whether 37 U.S.C.

11

overcome the presumption that the use of the word "may" renders the statute discretionary and not mandatory.

Furthermore, the language of the provisions for the Dental Officer Multiyear Retention Bonus in 37 U.S.C. § 301e parallels that of other statutes for reenlistment bonuses in Chapter 5 of Title 37. *Compare* 37 U.S.C. § 308(a)(1) ("The Secretary concerned *may* pay a bonus . . . to a member of a uniformed service who . . . reenlists or voluntarily extends the member's enlistment for a period of at least three years") (emphasis added), *with* 37 U.S.C. § 301e(a)(1) ("A dental officer . . . who executes a written agreement to remain on active duty for two, three, or four years . . . *may*, upon acceptance of the written agreement by the Secretary of the military department concerned, be paid a retention bonus.") (emphasis added). Therefore, under the rationale of *Larionoff* and *Hale*, 37 U.S.C. § 301e is a money-mandating statute for the purposes of this court's jurisdiction because of the long-standing tradition associated with providing bonuses to military members who voluntarily agree to extend their service obligations, coupled with application of the *Doe*, *Samish Indian Nation*, and *Perri* criteria.

The same rationale applies to the provisions for the Multiyear Incentive Special Pay in 37 U.S.C. § 302b.[14] The statute provides that an active duty dental officer "who is an oral or maxillofacial surgeon *may* be paid incentive special pay at the same rates, and subject to the same terms and conditions, as incentive special pay available for medical officers under [Sub]section 302(b) of this title." 37 U.S.C. § 302b(a)(6) (emphasis added).[15] Subsection 302(b) in turn provides that an active duty medical officer who signs a one-year active duty service agreement "*may* be paid incentive special pay for any twelve-month period during which the officer is not undergoing medical internship or initial residency training." 37 U.S.C. § 302(b)(1) (emphasis added); *see also* § 302(a) (stating the active duty requirement), § 302(c)

---

§ 301e would be considered "money-mandating" for officers not within this "automatically eligible" category.

[14] Section 302b and the associated Section 302 do not use the term "multiyear incentive special pay." Rather, the Navy, through regulation, has used these statutory provisions to distinguish between "incentive special pay" for medical officers who sign a one-year service agreement and "multiyear incentive special pay" for those who sign longer-term agreements. *See* OPNAV Instruction 7220.17, Enclosure 1 at 2-9 to 2-18 (discussing separate requirements for the incentive special pay and multiyear incentive special pay programs); *see also* Navy Bureau of Medicine and Surgery, *Fiscal Year 2015 Dental Corps Officer Special Pay Implementation Guidance*, http://www.med.navy.mil/bumed/Special_Pay/ (specifying that in the 2015 fiscal year, the incentive special pay for a one-year service agreement was $30,000, but the multiyear incentive special pay for longer-term contracts was $50,000 per year).

[15] Section 302b of Title 37 applies specifically to special pay for dental officers of the armed forces. Section 302 of the same title applies more generally to special pay for medical officers of the armed forces. The purpose of Paragraph 302b(a)(6) is to specify that oral or maxillofacial surgeons are considered "medical officers" as contrasted to "dental officers" for the purposes of this incentive special pay, and thus the applicable pay rates for medical officers and dental surgeons are the same.

(stating the active-duty-agreement requirement).[16] Because the incentive special pay is tied to the execution of a one-year active duty service agreement, it is equivalent to the reenlistment and retention bonuses provided in Sections 301e and 308 of Title 37. Like those sections, Sections 302 and 302b also provide "clear standards" to be eligible to receive such payments, and although these statutes do not dictate a precise amount of payment, they do provide an annual payment maximum. *See* 37 U.S.C. §§ 302(a)-(c), 302b(a)(6). Therefore, the statutes governing incentive special pay for medical officers and dental surgeons are also money mandating for purposes of this court's subject matter jurisdiction.

Accordingly, this court has subject matter jurisdiction over both of plaintiff's causes of action, and the government's motion to dismiss is DENIED.

B. *Judgment on the Administrative Record*

Plaintiff and the government have submitted cross-motions for judgment on the administrative record under RCFC 52.1(c).

1. *Review of the Navy Board's determination of plaintiff's active duty obligated service date.*

The court has the power to correct military records where the agency has violated its own regulations or procedures. *See Voge*, 844 F.2d at 779. However, the military's determination of a factual matter is given great deference, and the court will only overturn such a determination when it is "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Anderson*, 59 Fed. Cl. at 455 (quoting *Porter*, 163 F.3d at 1312); *see also Voge*, 844 F.2d at 779 ("Judicial deference must be at its apogee in matters pertaining to the military and national defense." (citing *Rostiker v. Goldberg*, 453 U.S. 57, 70 (1981))).

In this instance, there is no evidence that the Navy's records are inaccurate to the point of injustice to Commander Laughlin, or that the Navy Board's determination of plaintiff's active duty obligation was arbitrary, capricious, or unsupported by substantial evidence. There is also no evidence that the Navy violated any applicable law, regulation, or procedure in calculating plaintiff's service obligation. To the contrary, the relevant Department of Defense Instruction

---

[16]The Federal Circuit has ruled that the provision in 37 U.S.C. § 302(a) for "additional special pay" is money-mandating. *Voge v. United States*, 844 F.2d 776, 778-79 (Fed. Cir. 1988) ("There is no dispute that the Claims Court had jurisdiction under the Tucker Act . . . to entertain this suit because the [additional special pay] statute, 37 U.S.C. § 302, requires the payment of money to military medical officers."). And, additional special pay is similar to incentive special pay in that both are available to medical officers who are on active duty, are not undergoing medical internship or initial residency training, and execute a one-year active duty service agreement. *Compare* 37 U.S.C. § 302(a)(4) (provisions for additional special pay), *with* § 302(b) (provisions for incentive special pay). However, Paragraph 302(a)(4) states that an officer "*is entitled* to additional special pay," as contrasted to Subsection 302(b) which states that the officer "*may* be paid incentive special pay." *Id.* (emphasis added). Consequently, the rationale in *Voge* is not necessarily dispositive of the present case.

13

(DoDI 6000.13) unequivocally states that active duty service obligations incurred through military-funded training programs cannot be satisfied concurrently with any other service obligation, except obligations incurred for residencies or fellowships conducted at a military facility.  *See* AR 112 (quoting DoDI 6000.13, § 6.6.2.3); AR 522-23 (quoting DoDI 6000.13, § 6.6.3.1).  The instruction also states that time spent in a residency "shall not be creditable in satisfying the [active duty service obligation]."  Pl.'s Cross-Mot. at 23 (quoting DoDI 6000.13, § 6.4.9).

Despite his present allegations, Commander Laughlin had notice that he could not satisfy his active duty service obligation concurrently either with other service obligations or his medical residency and fellowship.  When he was accepted to the HPSP at the University of Pittsburgh, he signed a service agreement acknowledging that he "may not serve all or any part of the [active duty service obligation] incurred by participation in this program concurrently with any other military obligation."  AR 439 ¶ 17(b).  In 2006, well after his medical training began, plaintiff also stated in the funding application for his fellowship that his "commitment thus far to the Navy is nine years" and that he "fully understand[s] that if accepted to proceed with a fellowship in head and neck trauma and reconstruction this will increase [his] overall commitment."  AR 215.  Therefore, plaintiff cannot plausibly claim there was no "mutual agreement" for his service obligation to extend beyond 2011.  *See* Pl.'s Cross-Mot. at 23-24.

Commander Laughlin's case rests primarily on his allegation that he was told by Captain Welbourn in 2003 that by moving to the DUINS program, plaintiff could begin satisfying his active duty service obligation.  *See, e.g.*, Pl.'s Cross-Mot. at 25-26 (claiming there was an "implied-in-fact contract" between plaintiff and the Navy based on Captain Welbourn's alleged statements).  Plaintiff asserts that "[t]he record is replete with written communication[s] corroborating the veracity of [plaintiff's] position that he entered into a mutual agreement [to satisfy his service obligation concurrently]."  *Id.* at 26.  The evidence to which plaintiff points merely shows that when plaintiff raised the dispute over his obligated service date in 2010–years after the alleged implied-in-fact contract was made–some Navy officers thought that plaintiff's claims might be credible.  *Id.* at 26-27 (citing AR 322, 330 (in which Captain Reeg stated in 2010 that plaintiff might not have been "lying" about what he was told in 2003, but noting that plaintiff would normally be "expected to know the rules as a student no matter what he was told")); AR 47 (advisory opinion from Captain Wagner in 2011, postulating that a "claim of concurrent payback may have been the main driver" for plaintiff to have switched from the FAP to DUINS in 2003, "though there may be other reasons")).  In particular, plaintiff points to an e-mail from September 2010, in which Commander Michael Carson summarized a conversation with (then-retired) Captain Welbourn, as conclusive evidence of an implied-in-fact contract for plaintiff to serve his obligation concurrently.  Pl.'s Cross-Mot. at 26-27.  However, this e-mail shows nothing of the sort.  It states that Captain Welbourn remembered that plaintiff transferred to the DUINS program and that this process required "the approval of the ADM" (which according to plaintiff referred to Rear Admiral Dennis Woofter, the former chief of the Navy Dental Corps).  AR 125; Pl.'s Cross-Mot. at 26-27.  Commander Carson went on to state that Captain Welbourn "would like to see [plaintiff] not have to pay back more than 2012, but understands that the current instruction would have [plaintiff's] payback [until] 2016."  AR 125.  At most, the e-mail suggests that Captain Welbourn was supportive of plaintiff's continued

medical training, but it does not establish that plaintiff was promised he could satisfy his active duty obligation during this training.

Most significantly, even if Captain Welbourn (or another Navy officer other than the Secretary) told plaintiff at some point that he could satisfy his active duty service obligation concurrently with his training or other obligations, plaintiff has provided no evidence that these officers had the authority to override the Navy's regulations or procedures in this regard. Plaintiff notes that 10 U.S.C. § 2005 (which governs advanced educational assistance by the military and related active duty agreements) and DoDI 6000.13 provide the Secretary of the Navy "latitude in altering [active duty service obligations] by mutual agreement." Pl.'s Cross-Mot. at 24. Even if these provisions applied in the present case, plaintiff has neither provided evidence that the Secretary of the Navy approved an exception allowing plaintiff to satisfy his service obligation concurrently with his training or other obligations, nor shown that the Secretary authorized any other officer to do so.

In short, based on the administrative record, the Navy's and the Navy Board's determination of plaintiff's active duty service obligation was not arbitrary, capricious, or unsupported by evidence, nor did it violate applicable statutes and regulations.

2. *Monetary damages for multiyear retention bonuses and incentive special pay.*

Because this court has found that the Navy and the Navy Board did not err in determining that plaintiff's training-related active duty obligated service date is July 1, 2017, it need not reach the issue raised in plaintiff's second cause of action regarding multiyear retention bonuses and incentive special pay allegedly due. Nonetheless, the court notes that, based on the administrative record, plaintiff is not entitled to monetary damages for bonuses or incentive pay for which he never applied, and for which he never intended to apply prior to 2013. In 2011, when plaintiff contends his service obligation should have ended, plaintiff was not applying for multiyear retention bonuses or incentive special pay; he was trying to resign from the Navy. *See* AR 22-24 (plaintiff's Unqualified Resignation Request from Active Duty); AR 26-34 (reflecting continued pendency of that request through March 2013). Remarkably, this effort did not prevent plaintiff from receiving the single-year incentive special pay for fiscal years 2012 and 2013. AR 7, 24. Only once plaintiff's resignation request was denied in March 2013 did he apply for a multiyear retention bonus and incentive special pay and sign an accompanying three-year service agreement. AR 1-2. The government concurs that plaintiff was *eligible* for a multiyear retention bonus and incentive special pay starting in July 2011, not because he had fulfilled his active duty obligation, but because he had completed the requisite years of creditable service. Def.'s Mot. at 15. To receive a multiyear bonus and incentive special pay, however, plaintiff would have had to apply for these benefits and agree to the accompanying multiyear service obligation. He did not.

Accordingly, based on the administrative record, plaintiff is not entitled to monetary damages for multiyear retention bonuses or incentive special pay.

15

## CONCLUSION

For the reasons stated, defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED, defendant's motion for judgment on the administrative record is GRANTED, and plaintiff's cross-motion for judgment on the administrative record is DENIED.[17]  The clerk is directed to issue final judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

                                                 s/ Charles F. Lettow
                                                 Charles F. Lettow
                                                 Judge

---

[17]Plaintiff's motion to supplement the administrative record is GRANTED for the reasons stated *supra*, at 8 n.10.